**TEXAS CONTINENTAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**BANKERS BOND COMPANY, Inc., Elinore Sedley, Charles D. Dunne and J. E. Dunne II, Defendants.**

**No. 3747.**

United States District Court
W. D. Kentucky,
Louisville Division.
July 15, 1960.

16

Peter, Heyburn & Marshall, Henry R. Heyburn, Gavin H. Cochran, Mark B. Davis, Jr., Louisville, Ky., Ira Lee Allen, Dallas, Tex., for plaintiff.

Stites & Stites, Henry J. Stites, J. Leonard Walker, Arthur Grafton, A. Scott Hamilton, Louisville, Ky., Berko-

witz, Lefkovits & Paden, A. Berkowitz, Charles Najjar, Birmingham, Ala., for defendants.

SWINFORD, District Judge.

This is an action in which the plaintiff is seeking to recover $103,000 with interest on a sale to it of municipal bonds of the sixth class city of West Buechel, Jefferson County, Kentucky. The case was tried by a jury. At the conclusion of all the evidence, the plaintiff moved the court for a directed verdict in its favor. The motion was overruled and the case was submitted to the jury for its determination under instructions of the court. The jury was unable to reach a verdict and was discharged. Within ten days the plaintiff moved the court to enter a judgment in accordance with its motion for a directed verdict made at the close of all the evidence. Rule 50(b), Rules of Civil Procedure, 28 U.S.C.A. The record is now before the court on that motion.

From the evidence offered at the trial the following facts were developed. Except in possibly minor details these facts were uncontradicted.

The defendant, The Bankers Bond Company, Inc., is a corporation organized under the laws of Delaware but principally transacts business in the Commonwealth of Kentucky and maintains a principal office at Louisville, Jefferson County, Kentucky. It is engaged in the brokerage business and in the buying, selling and handling of securities. The securities in which it deals consist of about 50 per cent municipal business, 40 per cent regional and over-the-counter securities, and 10 per cent securities that are listed on the Midwest Stock Exchange. It has been in business since 1922 and is a well and favorably known firm.

The defendant, Mrs. Elinore Sedley, owns all of the stock of the Bankers Bond Company. She is chairman of the board and treasurer. She is the chief financial officer, is active in the business and has been continuously since the corporation was founded in 1922.

The defendants, Charles D. Dunne and J. E. Dunne II, are father and son respectively. They were officers of the corporation styled The Dunne Press, Inc. The Dunne Press published certain circulars, magazines or other papers of interest to insurance companies and persons in the insurance business. Through their business transactions the Dunnes became acquainted with various individuals and corporate entities in the insurance field. Among these were Ben Jack Cage of Jack Cage & Company and I. C. T. Insurance Company, both of Dallas, Texas, Continental Union Insurance Company, All States Life Insurance Company, of Dallas, and the plaintiff, Texas Continental Life Insurance Company, of San Antonio, Texas.

Another person who is prominently mentioned throughout the trial of the case is Colonel Henry J. Stites, attorney of Louisville, Kentucky. Colonel Stites, who has been a practicing attorney since 1913, is an attorney of record for the defendants. He has been the attorney for Mrs. Elinore Sedley since 1942 and a director of the defendant, Bankers Bond Company, since that time. Since 1928 he has done work for the company and has been recognized as its general counsel since that time. He has been retained as the lawyer for the company since October 1958. Colonel Stites was also the attorney and general advisor of the sixth class city of West Buechel and its sole legal advisor in the transactions leading up to and the issuance, handling and sale of the bonds involved in this action. The city of West Buechel was incorporated in October 1951.

Colonel Stites was also attorney for and director of the Rauen Construction Company, of which the defendant, Mrs. Sedley, owned one hundred per cent of the stock and served with Colonel Stites on the board of directors. The Rauen Construction Company owned a small tract of land of about three acres within the city limits of West Buechel. Another corporation, Kentucky Industrial Corporation, owned entirely by Mrs. Sedley and of which both she and

Colonel Stites were directors, owned a tract of twenty-one acres outside of but adjacent to the city limits. Fourteen or fifteen houses had been built on these two tracts of land.

On March 15, 1954, the defendant, Bankers Bond Company, wrote a letter to the Trustees of the City of West Beuchel, signed by Elinore Sedley, owner, chairman of the board of directors, and treasurer of the company, in which it proposed a two million dollar revenue bond issue for the building of sewers, waterworks, streets and drainage throughout the area in and *adjacent* to the city boundaries under the provisions of Chapter 58, Kentucky Revised Statutes. The letter stated that the Bankers Bond Company would prepare the issue and provide for the interest rate not to exceed 3⅝% and set forth various series and maturity dates of the bonds.

It also stated that "it will be futile to have a public sale with bidders, but since Section 58.040 permits the bonds to ' * * * be sold in such manner and upon such terms as the governmental agency deems best, or * * * may provide that payment shall be made in such bonds. * * *'. We have carried on negotiations with various insurance companies and others who may be interested in purchasing your revenue bonds."

The letter also contained the following paragraph: "We and our attorneys, Messrs. Stites and Stites, will do all the work incident to the issuance of said bonds, including the preparation of all resolutions, contracts, minutes and notices and we will pay all expenses including the cost of printing the bonds, advertising and any other expenses incurred in such issuance and sale, with the cost of the approving legal opinion. For our services, expenses and risk we will charge, and you will agree to pay an amount equal to any sum over par received for such bonds up to 3% of the face amount of all bonds sold, to be paid simultaneously with the delivery of the bonds. Of necessity title to the bonds must technically pass through The Bankers Bond Company in which event, upon securing an offer above par, as above outlined, for and in consideration of our services, without any expenditure other than moneys previously expended, we will take title to the bonds being sold and simultaneously pass title to the purchaser."

The Trustees accepted the proposal of the defendant, Bankers Bond Company, acting on the advice of Colonel Stites, and by proper ordinance authorized the issuance of two million dollars worth of revenue bonds. The numerous orders and minutes of the Board of Trustees required to effect the issuance of the bonds were prepared by Colonel Stites.

In a legal opinion he stated that the bonds were issued for the purpose of constructing a waterworks, sewer, drainage, and street system in the City of West Buechel with reserve facilities for water plant distribution and storage with equal monthly assessments provided by ordinance, payable with each water bill to provide the city with funds for the payment of the bonds and interest upon maturity. It further stated that from the proceeds of the sale of the bonds, there would be maintained a sinking fund for paying interest.

The purposes of the bonds were set forth on the face of the bonds themselves, clearly indicating that the proceeds from the bonds were to be used for the development purposes recited, from which revenues were to create a sinking fund for the retirement of the bonds upon their maturity and for current interest.

The title to the bonds was transferred to the defendant, Bankers Bond Company. A circular setting out the opinion of Colonel Stites was issued by the Bankers Bond Company in its efforts to sell the bonds. The bonds were printed by the Dunne Press, of which the defendant, Charles D. Dunne, was an officer and in a managerial position. Through the defendants, Charles D. Dunne and J. E. Dunne II, the Bankers Bond Company and Jack Cage & Company of Dallas, Texas, opened negotia-

tions for the sale of the entire two million dollar bond issue.

The negotiations between the Bankers Bond Company and Ben Jack Cage culminated in a sale of the bonds to Jack Cage & Company. In consideration for the bonds the purchaser paid the sum of $335,000 in cash and executed a promissory note in the sum of $1,725,000 of September 6, 1954, which is in words and figures as follows:

"Promissory Note
"Dallas, Texas
"$1,725,000.00      September 6, 1954

"For Value Received, Jack Cage & Company, a Texas corporation, does hereby promise to pay to the order of The Bankers Bond Company, Incorporated, at the office of First National Bank in Birmingham, Alabama, the sum of One Million Seven Hundred Twenty-Five Thousand and no/100ths Dollars ($1,725,-000.00), plus interest thereon at the rate of five percent (5%) per annum, from date to the date of maturity.

"The principal on this note shall be payable in seven (7) equal annual installments; each of which shall be in the amount of Two Hundred Forty-Six Thousand Four Hundred Twenty-Eight and 57/100th Dollars ($246,428.57). The first installment of principal shall be due and payable on March 15, 1956, and an installment of principal shall be due and payable on March 15 of each year thereafter until this note is paid in full. The interest on this note shall be payable as it accrues upon the unpaid principal balances hereof, on each date that an installment of principal becomes due and payable.

"This note may be prepaid in part or in full at any time without penalty.

"This note is secured by that certain Assignment of even date herewith from Jack Cage & Company to The Bankers Bond Company, Incorporated.

"The first installments of principal and interest of this note (due March 15, 1956) shall be paid in cash. With the exception of the first installments of principal and interest of this note (due March 15, 1956), all other installments of principal or interest or principal and interest of this note may be paid in cash or by the transfer, without recourse, to the holder hereof of Revenue Bonds issued by the City of West Buechel, Jefferson County, Kentucky. In the event of the payment of any such installment by the transfer of one or more such Revenue Bonds, such Revenue Bonds shall be accepted by the holder of this note as the equivalent of cash in the amount of the then unpaid principal balance of the bonds transferred, plus accrued and unpaid interest thereon.

"In the event of failure to pay when due any installment of this note, or in the event of the breach of any of the agreements contained in said Assignment, the holder hereof may declare the unpaid principal and accrued and unpaid interest on this note immediately due and payable.

"Each maker, surety, endorser and guarantor of this note does hereby waive presentation of payment, notice of non-payment, protest and notice of protest and does hereby agree to all extensions and renewals of this note, without notice.

"In the event this note is placed in the hands of an attorney for collection after maturity, the undersigned maker agrees to pay an additional amount equal to a reasonable attorney's fees.

"Jack Cage & Company
"Attest:
"(s)
"Secretary-Treasurer

"By (s) Wile E. Ball
"Vice President"

This note was assigned by Bankers Bond Company to the City of West Buechel without recourse on December 8, 1954.

From the cash payment, Bankers Bond Company received a fee of $60,000. Out of this sum it paid a fee of $20,000 to Mr. Arlie Baker of Detroit, Michigan, which was explained in the evidence as being a "finder's fee" or a service of that nature. It should be pointed out that the record discloses no connection which Mr. Baker had with the transaction except that he was the husband of the former wife of the defendant, Charles D. Dunne, and stepfather of the defendant, J. E. Dunne II. I state this fact, not that it has a material bearing on the outcome of the case, but for the purpose of showing the connection between the recipient of this money and certain defendants against whom judgment is sought. Colonel Henry J. Stites received from this sum the amount of $10,000 and Bankers Bond Company kept $30,000. The City of West Buechel received $275,000.

From the Texas end of the transaction, the defendants, Charles D. Dunne and J. E. Dunne II, had made the contact and carried out the necessary planning to induce the purchase and to negotiate the sale and delivery of the bonds. Through its messenger, T. H. Hayden, comptroller of The Dunne Press, Inc., transported the bonds from Louisville, Kentucky to Dallas, Texas in a commercial airplane. At the time of the delivery Jack Cage & Company promised to pay the Dunnes $100,000 for their assistance in making the transaction. Twenty-five thousand dollars in cash was paid to Charles D. Dunne and J. E. Dunne II with a promise to pay the remaining $75,000 in deferred payments.

Two payments were made by draft on the Republic National Bank of Dallas, Texas and transmitted by mail to the Liberty National Bank and Trust Company, Louisville, Kentucky, as credits on the $1,725,000 note. No further payments were made and the note became in default.

The bonds were never advertised for sale or made available for purchase to investors through normal channels of publicity in related cases. The receipt of all moneys for the bonds was handled by the Bankers Bond Company in a special account and under a different arrangement from that of any other bond issue that had been handled by the Bankers Bond Company up until that time. It was not brought under the supervision of the vice president of the Bankers Bond Company, who was in charge of the municipal department, as all other issues had been with possibly one exception. The account was subject only to checks signed by Mrs. Elinore Sedley and Colonel Stites.

The record discloses that the City of West Buechel had a population of 350 to 400 people; that the property owned by Mrs. Sedley's two companies, Rauen Construction Company and Kentucky Industrial Corporation, was only sparsely settled and had living on it a small percentage of the population. Notwithstanding this disparity between what is called in the evidence the "old part" or densely populated part of the town and the "new part" or sparsely populated part of the town which belonged to Mrs. Sedley, approximately 66 per cent or two-thirds of the money received from the sale of the bonds was spent on the "new part" while only one-third was spent on the "old part" of the town.

After the sale of the bonds to Jack Cage & Company, Charles D. Dunne and J. E. Dunne II sought to resell some of the bonds for Jack Cage & Company on a commission basis.

The plaintiff, Texas Continental Life Insurance Company, was organized in 1955. It had borrowed a substantial sum of money from Mr. Bevie F. Biggers of Dallas, Texas. The bonds involved in this lawsuit were purchased for the plaintiff by Mr. Biggers because of his financial interest in the company. The sale of the bonds was made by Ben Jack Cage of Jack Cage & Company, who contacted Mr. Biggers and was introduced to him by the defendant, Charles D.

Dunne. The sale was made and the transaction concluded in April of 1955. Mr. Biggers was not at the time either a stockholder, officer or director of the plaintiff company but was acting solely as its agent in the purchase of these bonds. At the time of the transaction, Mr. Biggers had before him the prospectus which had been issued by the Bankers Bond Company. He had no knowledge of the transaction between Bankers Bond Company and Jack Cage & Company in the sale of the bonds for part cash and the promissory note with its reservations on the question of payments and the right of the payor to credit the note or pay it off with the bonds.

On January 6, 1959, in a companion case of All States Investors, Inc. v. Bankers Bond Company, Inc., et al., No. 3646, the court held that the bonds were invalid. The ruling was based upon a construction of Sec. 58.040, Kentucky Revised Statutes, and on the authority of rulings of the Court of Appeals of Kentucky in Guthrie v. Curlin, Ky., 263 S.W. 2d 240; Webster County v. Hall, 275 Ky. 54, 120 S.W.2d 756; Eagle v. City of Corbin, 275 Ky. 808, 122 S.W.2d 798; Pulaski County v. Ben Hur Life Ass'n, 286 Ky. 119, 149 S.W.2d 738.

This action seeks to restore the parties to their former position by permitting the plaintiff to recover the money which it paid for the invalid bonds. The plaintiff is not asking for additional damages or raising any question as to losses which might have been sustained. It is alleged that the defendants have conspired together and acted in concert for the purpose and with the intent of knowingly violating the law by arranging and taking part in the sale of the bonds on credit and the concealment of the true facts connected with the issuance and handling of the bonds.

The case was practiced along two lines. The plaintiff claimed that it had been defrauded and was entitled to recover on a common-law action of fraud and deceit. It further claimed that the defendant, Bankers Bond Company, was in violation of the provisions of the Federal Securities Exchange Act of 1934, as amended, 49 Stat. 704, U.S.C.A., Title 15, Section 78g (c) (2), which is:

"(c) It shall be unlawful for any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium of any such member, directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer * * (2) Without collateral or on any collateral other than exempted securities and/or securities registered upon a national securities exchange, except in accordance with such rules and regulations as the Board of Governors of the Federal Reserve System may prescribe * * * ."

It is further claimed that the defendants by virtue of their acts and conduct, implemented by use of the United States mails and various letters and documents sent through the United States mails, were in violation of Rule X–10B–5 of the Federal Securities & Exchange Commission which is as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange (1) to employ any device, scheme or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The complaint further states that the acts and conduct of the defendants, implemented by their use of the United States mails and letters and documents sent through the mails, were in violation of the Federal Securities Act of 1933.

as amended, 48 Stat. 84, U.S.C.A., Title, 15, Section 77q, which reads as follows:

"(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement or a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

"(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

"(c) The exemptions provided in Section 77c of this title shall not apply to the provisions of this section. May 27, 1933, c. 38, Title I, Sec. 17, 48 Stat. 84."

The common-law action for fraud, deceit, misrepresentation, and covin must necessarily be based on a factual situation from which deductions must be drawn and is primarily a case for determination by a jury. The question was submitted to the jury under instructions of the court and on the basis of the court's opinion that the evidence was of such a nature that it should not be determined as a matter of law that the defendants had entered into a conspiracy to defraud the plaintiff. The court is still of that opinion and as to the common law action for fraud, the motion for a directed verdict should be overruled.

In view of the conclusions as reached on the second or statutory cause of action, it is unnecessary to comment further upon or consider the common-law cause of action and this opinion will be devoted to a discussion of the rights of the plaintiff under the provisions of the Federal Securities Exchange Act of 1934 and the Federal Securities Act of 1933, both as amended.

The court has jurisdiction of the action under the provisions of 15 U.S.C.A. §§ 77v and 78aa.

It is the purpose of the legislation in both the 1933 and 1934 Acts to provide full and fair disclosure of what is behind, in a material way, securities sold in interstate commerce and through the mails. It is common knowledge that the public had been duped for many years in the purchase of what were represented to be guilt-edged securities. It was for the purpose of stopping this fraud, by those who had securities to sell, either as owners or brokers, that the President of the United States in a special message urged that there be added to the ancient rule of *caveat emptor* the further doctrine of "let the seller also beware". Courts have pointed out that the legislation was designed to protect investors and placed upon issuers, underwriters and dealers, requirements to make full and fair disclosure of the character of the securities. Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168.

The responsibility for reprehensible acts of omission or commission is placed upon those who purport to issue

statements for the public's reliance. The statutes create a special action to recover which differs *substantially* from the common-law action in that the seller must assume the burden of proving lack of knowledge. Wilko v. Swan, supra.

■ The undisputed facts of this case bring it squarely within Rule X–10B–5. Under the statute and rule, one who has bought worthless securities is not put to the difficult and onerous burden of proving to the satisfaction of a court or jury that the seller lacked integrity. Sec. 10 (b) of the Act of 1934 (15 U.S.C.A. § 78j (b)) creates a remedy in addition to the common-law right of action for fraud by describing the proscribed conduct as unlawful. Fischman v. Raytheon Mfg. Co., 2 Cir., 188 F.2d 783. The word "violation" is not limited to a criminal case but includes civil litigation. Osborne v. Mallory, D.C., 86 F.Supp. 869.

■ I am of the opinion that it was the intention of the Congress by this legislation to give the purchaser of invalid bonds a right to recover without the necessity of offering proof of deceit and intentional fraud. The statute contemplates a new right of action for the good-faith purchaser to recover from the seller for constructive fraud which grows out of the failure to make a full and complete disclosure.

■ Not only is the corporation which holds title to the securities at the time of sale, but also its officers, authorizing the sale of such stocks, are legally responsible to purchasers in good faith, even though the act for the corporation is done through mistake and without fraudulent intent. 47 Am.Jur. Sec. 44, p. 596. See also Errion v. Connell, 9 Cir., 236 F.2d 447.

■ A plaintiff purchaser need only prove that a statement in a prospectus or oral communication is in fact false or is a misleading omission and that he did not know of such untruth or omission. Ouachita Industries, Inc. v. Willingham, D.C., 179 F.Supp. 493; Thiele v. Shields, D.C., 131 F.Supp. 416.

■ By showing that the defendants breached their duty by failing to make disclosures and by withholding facts which in good conscience they should have revealed, the plaintiff established its case. Without proof of the elements of fraud and deceit as at common law, the remedy is an accounting to the plaintiff for the money it paid out for the defendants' worthless paper. Kardon v. National Gypsum Co., D.C., 73 F.Supp. 798; Dupler v. Simmons, D.C., 163 F.Supp. 535.

By restoring the parties to their former status, if the theory of each litigant is accepted, no one is hurt. The defendants contend that the bonds are valid and worth what the plaintiff gave for them. If that be ultimately determined to be the case, the defendants would lose nothing by a cancellation of the transaction and a restoration to the plaintiff of its money. If it should be determined that the bonds are worthless, to permit the defendants to retain the money for bonds which they launched into the channels of trade without compliance with the established law in the issuance and sale of such securities would be to ignore the salutary purposes of the Securities Exchange Act of 1934 and the defrauded purchaser would be relegated to whatever remote remedy he might have before the statute was passed.

■ The rule is succinctly stated in the opinion of the court in Smith v. Bear, 2 Cir., 237 F.2d 79, 87, 60 A.L.R. 2d 1119.

"The federal securities laws require a high state of honesty and morality of brokers and dealers in transactions with customers. If a broker or dealer employs any device, scheme or artifice to defraud or makes an untrue or fraudulent statement of a *material* fact to a customer to induce him to purchase a security, or if he fails to state a material fact, which, in the light of all the circumstances, is necessary to make other facts stated not misleading, or if he extends credit to a customer in violation of the Act or the

regulations promulgated pursuant thereto, all to induce a customer to purchase securities, then the broker has violated the law and the customer may recover from him any loss proximately resulting therefrom."

To quote from the opinion of the Supreme Court in Securities and Exchange Commission v. W. J. Howey Co., 328 U. S. 293, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244, "the statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae."

In applying the rules of law which I have set out in this opinion to the undisputed facts, there can be but one logical conclusion and that is that the defendants and each of them are liable to the plaintiff for the amounts set forth in the prayer of the complaint. The defendant, Mrs. Elinore Sedley, and her attorney, Colonel Stites, acting on behalf of the defendant, the Bankers Bond Company, with the active aid, assistance and participation of the defendants, Charles D. Dunne and J. E. Dunne II, created and brought into existence two million dollars worth of securities, which, by a series of interstate transactions and communications, they launched into the channels of trade by selling them to a purchaser, who in turn sold them to the plaintiff. It is not necessary that the court find on this motion that there was actual premeditated fraudulent and deceptive planning on the part of the defendants. Whether there was or not, the results are the same.

It was represented to the plaintiff that these were municipal bonds on which the interest was to be paid and which were to be retired on the revenue derived from a municipal development for which the purchaser's money was to be used. It was not revealed to the purchaser that the defendants had entered into a private contract whereby a note for a part of the purchase price was executed containing a provision that the note might be paid with the bonds. Such a plan cannot be called anything but an imposi-

tion upon or deception of a purchaser without notice of such unusual circumstances. The fact that this plaintiff's money was used to pay commissions, attorney's fees and coordinate development of property owned by the defendant, Elinore Sedley, who was in turn the owner of the defendant, Bankers Bond Company, is but a circumstance. It might be considered in determining the question of conspiracy to defraud under the common law but for the determination of the rights of the plaintiff under Rule X–10B–5, it is not greatly material. This court takes the straight road and that is that a material fact was withheld from the plaintiff at the time it, in good faith, invested its money. The material fact was that the bonds had been sold, not for cash where the money could immediately go to work, but for a promissory note which turned out to be worthless and the further fact that the note itself could be redeemed or credited at any time by the bonds themselves.

The defendants argue strenuously that the plaintiff should be denied recovery because there was no privity between the plaintiff and the defendants at the time of the sale. The court is of the opinion that such a fact is not material under the statute. Rule X–10B–5 admits of no such loophole but on the contrary speaks of the duties and obligations of the seller. It is common knowledge that there is frequently lack of privity of contract between a bonding house handling an issue of bonds and the ultimate investor. One of the purposes of the legislation was to prevent an imposition upon the public by individuals and corporations whose business was dealing in securities and who had training, knowledge and experience in the practical processes of a bond issue and the property and potential back of it.

The defendants cite in support of their contention, among other cases, the case of Joseph v. Farnsworth Radio & Television Corp., D.C., 99 F.Supp. 701. This was a case in which the complaint was dismissed for failure to state a cause.

of action. The court did say a semblance of privity between vendor and purchaser of securities seems to be requisite. At best, that is not a very strong statement and indicates some doubt in the mind of the court. It should also be noted that the case was testing the allegations of the complaint, unlike the case at bar where the evidence for both sides was all in. At any rate, I cannot agree that under the state of case before me, privity of contract was a necessary fact to sustain the plaintiff's case on the incident motion.

Without citation of authorities, the court accepts the rule advanced by the defendants to the effect that on a motion of this character, the evidence must be construed in the light most favorable to the defendants and I have so construed the evidence. The difficulty with the defendants' case is that they must admit the execution of the note to some of them and the provisions of the executed note. In addition to this, they must admit the prospectus and opinion of Colonel Henry J. Stites handed down on March 15, 1954 and on November 15, 1954, in which it was stated as follows:

"These bonds are issued for the purpose of constructing a water works, sewer, drainage and street system. * * *

"From the proceeds of the sale of these bonds a sum equal to the interest which will accrue for a period of one year on the issued bonds will be maintained in the sinking fund for paying current interest and safeguarding payment of future interest."

The defendants well knew that no such sinking fund could be created from a development which could not be had with a promissory note which could be redeemed by a use of the bonds themselves.

In the light of all the evidence, I must conclude, as heretofore indicated, that the plaintiff's motion for a directed verdict should be sustained. An order to that effect is this day entered.